## O'Bannon, Executrix, etc., v. Vigus.

1. *Determining Questions of Fact.*—In determining questions of fact and in passing upon the question as to whether a verdict is against the weight of the evidence, the Appellate Court will take into consideration all matters affecting the creditabilities of the witnesses, such as the apparent interest of the witness, his opportunities of knowing the matters

about which he testifies, the reasonableness or unreasonableness of his testimony when tested by rules of common sense and judgment or when compared with other matters in evidence and undisputed so far as such matters appear of record, and will exercise a judicial discretion and judgment in determining the same.

2. *Receipt as Evidence.*—The rule of evidence as to the weight of a receipt and of the kind and amount of proof required to overcome it applies to receipts conceded or shown to be genuine and not to such as are shown to be false or forged.

3. *Receipts—Weight as Evidence.*—The fact that a receipt is forged or altered after its execution may be shown by a bare preponderance of the evidence.

4. *Verdict Unsupported by the Evidence.*—A verdict unsupported by the evidence, and against the great weight and body of it, will be set aside.

Memorandum.—Claim against the estate of a deceased person. Appeal from a judgment in favor of the claimant rendered by the Circuit Court of Montgomery County; the Hon. James A. Creighton, Circuit Judge, presiding. Heard at the May term of this court, A. D. 1891, and reversed. Opinion filed December 2, 1892.

## Appellant's Statement of the Case.

Eliza Vigus, the mother of appellee, on the 23d day of May, 1872, took out a policy in the Protection Life Insurance Company, of Chicago, for $5,000, payable to appellee. She died on the 12th of October, 1874. Proofs of loss were duly made to the company. At the request of appellee, R. W. O'Bannon, the deceased, went to Chicago early in January, 1875, to collect the amount of the policy. In two or three days he returned, and brought with him a note and check for $1,000 each, dated January 5, 1875. They were accepted by appellee, and on the same date he gave a receipt to the company in full payment of the policy.

O'Bannon died on the 13th of November, 1883. Appellant was appointed his executrix, and on the 19th of June, 1884, appellee filed his claim against the estate, as follows:

" Estate of R. W. O'Bannon, deceased,

" To Darius L. Vigus, Dr.

" To the sum of $3,000, collected and received by said O'Bannon, to the use of said Vigus, of the Protection Life Insurance Company, of Chicago, on policy No. 4266, on the life of Eliza Vigus, now deceased, on, to wit, the 4th day of March, A. D. 1875, with interest thereon at

the rate of six per cent. per annum. Said money having been collected by said O'Bannon while acting as claimant's agent; the collection of which sum was by said O'Bannon fraudulently concealed from the claimant during the lifetime of said O'Bannon."

The policy was for $5,000. Two thousand dollars were collected by O'Bannon and paid to Vigus. As to this there is no dispute. The contention is as to the $3,000.

The evidence offered to show the liability of the estate was the following receipt on the back of the policy:

" Received of the Protection Life Insurance Company five thousand dollars, being amount in full of the within policy.

"(Signed)                    D. L. VIGUS.
                          By R. W. O'BANNON."

This receipt was without date. It was written by Terpenny, the book-keeper of the company, except the words, " five thousand," and the signature. He said: " O'Bannon was in the office of the company when he wrote the receipt."

It is claimed that the receipt was false, the words five thousand dollars having been filled in after it was signed by O'Bannon.

ANTHONY THORNTON, LANE & COOPER, and R. McWILLIAMS, attorneys for appellant.

APPELLEE'S BRIEF.

Upon a second appeal, the decision of the court on the former appeal is conclusive of the questions then involved. Greene v. City of Springfield, 130 Ill. 513; Hook v. Richeson, 115 Ill. 431–443; The Washburn & Moen Mfg. Co. v. The Chicago Galvanized Wire Fence Co., 119 Ill. 30–42; Smith v. Neff, 123 Ill. 310–13; Mix v. The People, 122 Ill. 641; Reed v. West, 70 Ill. 479; Ogden v. Larrabee, 70 Ill. 510; Rising v. Carr, 70 Ill. 596; Smith v. Brittenham, 94 Ill. 624; Moshier v. Norton, 100 Ill. 63; Newberry v. Blatchford, 106 Ill. 584; Johnson v. Kettler, 84 Ill. 315; Walker v. Doane, 108 Ill. 236; The Village of Desplaines v. Poyer, 22 Ill. App. 574, and cases cited; Keiser v. Cox (Third District), 16 Ill. App. 631; The Chicago, Milwaukee & St. Paul Railway Co. v. Snyder, 27 Ill. App. 476.

A man may perpetrate a fraud by knowingly telling a

falsehood, or by recklessly affirming that to be of his own knowledge which he does not know to be true. Case v. Ayers, 65 Ill. 142; Allen v. Hart, 72 Ill. 104; Chatham Furnace Co. v. Moffatt, 147 Mass. 403; 9 Am. St. Reps. 727; Bigelow on Fraud, 61–3; Kerr on Fraud & Mistake, 54; Bennett v. Judson, 21 N. Y. 238; Cabot v. Christie, 42 Vt. 121; Lobdell v. Baker, 1 Met. Mass. 194, top of page 201; Monroe v. Pritchett, 16 Ala. 785; 1 Smith L'd'g Cas., Pt. 1, 301, 302.

Vigus appointed O'Bannon his agent to go to Chicago, and gave him full and unlimited power to settle the claim. "Agents also occupy a relation of trust, with peculiar opportunities for fraud upon their principals; and the rules of law, in respect of transactions between them concerning the interest in trust, are in some particulars more unfavorable to the agent than the rules relating to attorney and client are to the attorney," says Bigelow in his work on Fraud, 222.

"Loyalty to his trust is the first duty which the agent owes to his principal. Without it the perfect relation can not exist. Reliance upon the agent's integrity, fidelity and capacity is the moving consideration in the creation of all agencies." Mechem on Agency, Sec. 454.

O'Bannon "assumed voluntarily, a confidential relation," and appellant "can not be allowed to enjoy a personal advantage by saying that O'Bannon was not entitled to the confidence Vigus placed in him." Gruhn v. Richardson, 128 Ill. 178–186; Pomeroy v. Benton, 57 Mo. 531; Cottrill v. Krum, 100 Mo. 549; C. & N. W. Ry. Co. v. Goebel, 119 Ill. 515–524.

O'Bannon is clearly shown to be the wrongdoer; then, as between him and Vigus, the presumptions respecting disputed facts are with the latter. Costigan v. Mohawk, etc., R. R. Co., 2 Den. (N. Y.) 609; Time v. Wharf Co., 7 Cal. 253; Loomis v. Green, 7 M. E. 386; Pierce v. Millay, 62 Ill. 133; Millard v. Swanson, 22 Ill. App. 424; Wear v. Duke, et al., 23 Ill. App. 322; C., I. & W. Co. v. Badger, 30 Ill. App. 314; McMahon v. Sankey, 35 Ill. App. 341; C., B. & Q. R. R. Co. v. Merckes, 36 Ill. App. 195.

GEORGE L. ZINK and J. M. TRUITT, attorneys for appellee.

OPINION OF THE COURT.

On the night of Sunday, January 5, 1873, R. W. O'Bannon went from Raymond, in Montgomery County, to Chicago, as the agent of appellee, to collect what he could on a policy of the Protection Life Ins. Co. for $5,000 upon his mother's life for his benefit. On the night of Tuesday, the 5th, he returned, reported to him a compromise and settlement, subject to his approval, with A. W. Edwards, secretary and manager of the company, for $2,000, as the best he was able to make, and advised him to accept it. At the same time he tendered the company's check of January 5, for $1,000, and its note, at sixty days, of the same date, for a like sum, both payable to his order. After hesitation and discussion, appellee accepted them, and signed a receipt of the same date, which had been prepared by Edwards, in full of the policy, but without stating the amount; which was returned to the company on Friday, the 8th. Appellee never received anything more on the policy, but the further sum of $3,000 was afterward assessed and collected by the company on account of this loss, and paid to somebody on its check of March 4th, made payable to his order. This check was drawn by Mr. Terpenny, the book-keeper, by direction of Edwards, and delivered to him; was paid some time in June, and on its return by the bank was placed by Terpenny with the other papers in the case in the company's vault, to which Edwards had access. No further trace of it appears. In 1877 the company failed. Edwards removed to Dakota in 1879. His deposition was taken, and he strangely denied all recollection of the check settlement or claim. Terpenny, who continued in the service of the receiver or assignee after the failure, looked for it carefully, and found all the other papers relating to the case together in their proper place, but this check was gone and has never been traced. The check for $1,000 given to Vigus and the check given the bank cashier to pay the note were signed by Hillard, as president, and Edwards as secretary,

according to the custom. The one for $3,000 was signed by Edwards, as secretary, but by whom else or how it was indorsed Terpenny did not recollect, nor was it otherwise shown.

In his search for it in July, 1883, he found among the papers the policy in question, with a receipt indorsed thereon, purporting to be for " five thousand dollars, being amount in full of the within policy," without date, and all in his own handwriting except the words " five thousand," which were in that of Edwards, and the signature, which was " D. Vigus, by R. W. O'Bannon," and in the handwriting of the latter. In October following he casually informed appellee of this receipt, and thereupon an action on the case was instituted against Edwards.

O'Bannon was then on his death bed, and died on the 15th of the next month. Appellee afterward dismissed his suit against Edwards, and on the 30th of June, 1884, filed this claim in the County Court against the estate of O'Bannon for the amount of the missing check and interest from its date—alleging that O'Bannon had collected it as his agent and fraudulently concealed the fact.

There the claim was disallowed. The case has been three times tried in the Circuit Court and brought here on appeal from its judgments. The first was for the defendant, which we affirmed on the merits (19 App. 241), but the Supreme Court reversed it and ours. (118 Ill. 334.) On the second trial some changes of more or less importance were made by some of the witnesses in their statements on the first, and some new evidence introduced on each side; and the judgment was for plaintiff. We thought these changes and additions weakened his case and positively strengthened the defense. His rested, as before, on O'Bannon's receipt as it then appeared on the policy, his alleged admission to Miller in the spring of 1875, and statement made on his return from Chicago about the cancer letters.

We discredited all this evidence; the receipt, because the words " five thousand " were inserted without his authority where it was blank when he signed it; and the admission

and statements, because the testimony tending to prove them was unreliable and improbable in itself, inconsistent with better attested facts, supported only by assumptions which were themselves unsupported and more rationally explained by the supposition that they were misunderstood. Thus, if the admission to Miller, as stated by him, was embodied in a request that was in the highest degree insulting to a man of honor and yet was not resented nor disclosed until O'Bannon was dead and this claim had been disallowed by the County Court, was not true in fact, and would expose his own estate to loss and his reputation to ruin, reason and charity would force the belief that it was not so intended by O'Bannon, and never so understood by Miller until he heard of the surprising receipt on the policy, but always before as having been in substance the same that had been made to Vigus and others before and about that time, namely, that he had settled the claim of Vigus upon a five thousand dollar policy, and not that he had collected $5,000 upon the policy.

So also, of the alleged statement about the cancer letters or letter; if it was improbable on its face, untrue in fact, needless or rather hurtful and hindering to the purpose supposed to be in view, likely to lead to injury, easy to be disproved, with consequences certainly ruinous to himself and disgraceful to his family, every fair mind would naturally look for some explanation which should make it more probable that the witnesses were mistaken than that he made or intended to make such a statement. All of this was true and proved of the statement alleged, and an explanation was suggested, which has not been shown nor attempted to be shown to be inadmissible.

On the other hand, the clear weight of the evidence seemed to show that on January 5, 1875, O'Bannon in good faith finally settled the claim in question for the check and note of $1,000 each, that he delivered to appellee, and no more, subject to his ratification. For it established the following facts: Proof of death of the insured was submitted to the company November 28, 1874. By the terms of the policy

it had ninety days from that date within which to pay the
loss. Appellee wanted money, for a special purpose, as soon
as he could get it. He began at once to importune the com-
pany for it. Edwards paid no attention to his letters. For
some reason he soon came to expect he would have to sub-
mit to a compromise, if he got anything. His mother had
been treated for cancer existing before the policy, which had
lapsed, was reinstated, though it does not appear that O'Ban-
non knew or had any intimation of it before he went to
Chicago on this business. He went on short notice, in place
of his son who had been first engaged, because of his long
and friendly acquaintance with Edwards. He went expect-
ing to compromise, and authorized to do so on the best terms
he could get. At what time on the morning of the 4th he
arrived at Chicago, or how soon afterward he saw Edwards
was not shown. Doubtless he saw him on that day, but not
at his office. They discussed the claim, probably at con-
siderable length. Edwards told him the company had in-
formation that when the policy was reinstated Mrs. Vigus
was not a fit subject for insurance, and particularly, at least,
that she had been injured by a fall on the street at Litch-
field for which she had recovered damages against the city.
It did not appear that in that interview anything was said
about cancer, unless from statements of O'Bannon on his
return. Finally, however, Edwards made him as low an
offer as $2,000, and no more. O'Bannon hesitated to accept
it, and they separated without a settlement on that day.
Up to this time, surely, it can not be pretended that their
action was not natural, business-like, in good faith and at
arm's length. On the next day O'Bannon appeared at the
office of Edwards, which was occupied by Terpenny also,
whose desk was only about ten feet from that of the secre-
tary, and while there Terpenny, by direction of Edwards,
drew or filled up and delivered to him the note and check
for $1,000 each and the receipt on the policy with a blank
space for the amount, and Edwards prepared the receipt in
full for appellee to sign if he would. Whether the note and
check were printed and already or ever afterward signed by

the president or vice-president, does not appear; but they were duly paid. The policy was left with Edwards, and O'Bannon, with the note, check and receipt to be signed by appellee, took the evening train for Raymond. Terpenny made an entry on the books of the company, of the same date, showing that the note was given for the "balance due," all that remained to be paid on the policy. There was no evidence tending to prove that O'Bannon ever afterward had any communication with any agent of the insurance company or of the bank, or knew of the filling of the blank in his receipt or of the existence of the $3,000 check, except his alleged admission to Miller, and the fact, if it was a fact, of which there was some evidence, that he went again to Chicago at some time in the following spring, which in our judgment was fairly overcome by the two receipts in full, the book entry and the other facts stated.

If a final settlement could be proved by circumstances, these, not otherwise explained, would prove it. All of them having so appeared on the first trial, we found it was then and thus made; and that fact alone, if such was the fact, would of itself effectually dispose of the alleged admission, and make wholly immaterial in this action whatever lies O'Bannon might have told to justify his settlement or induce its ratification.

Feeling the force of these circumstances, appellee introduced as a new witness on the second trial Martin Ryan, the actuary of the company, who testified, that about the first of January, 1875, Edwards, at his office, introduced him to O'Bannon; that they proceeded to talk about this claim; that O'Bannon urged its "settlement," and Edwards "seemed disposed to favor him, but said it had not been assessed for yet. O'Bannon desired some money immediately, on that occasion. Edwards agreed to give $1,000 down or a check for $1,000, and a draft or note at sixty days—I think it was for another $1,000—*and the balance when the claim was assessed for and collected;*" that Edwards then handed to witness the proofs of loss and told him to see that it got into the next assessment (without stating the amount), to be sent

out early in February, and then directed the book-keeper to draw up the check and note for $1,000 each, which the book-keeper apparently proceeded to do.

The case of plaintiff and the reputation of Edward were in urgent need of some such evidence as this statement that he then agreed to pay on this policy $3,000, in addition to the note and check then given, when the claim was assessed for and collected; but it could not be made to fit the facts. It was conceded upon the uncontradicted testimony of Charles A. Walker, the attorney of the company, who was also a new witness on the part of the defense, that no longer than the day before, after some discussion in his office, which was in the same building, and just over that of Edwards, O'Bannon and Edwards, in his presence, absolutely agreed on a compromise and settlement of the claim for $2,000, which Edwards had first offered; that O'Bannon seemed well pleased with that agreement, having been satisfied by Walker that the claim would be resisted if pushed, and that $2,000 paid would probably be better for appellee than a judgment for the full amount; and that upon coming to the agreement O'Bannon and Edwards went down stairs together. We believed then, and think we can now show more clearly, that the meeting spoken of by Ryan took place immediately upon the agreement to compromise spoken of by Walker; that they went directly from his office to that of Edwards, and that the conversation between them there had no reference whatever to the amount, because that had just been agreed on, but solely to the time and manner of its payment, which had not been settled upstairs. Even according to Ryan, O'Bannon wanted some money immediately, and the disposition of Edwards to favor him was shown by his consent to give $1,000 in cash, and a note, on which money could be immediately raised, for the residue. But upon the contention of counsel as to the time of the agreement on the amount, we said in the former opinion:

"We are asked to believe that this secretary, who, notwithstanding his friendship for O'Bannon, on Monday, for the substantial reasons stated, in the presence and with the

concurrence of the company's attorney, committed himself
to a peremptory refusal to pay more than $2,000, and actu-
ally got an agreement to settle for that amount, with which
O'Bannon seemed well pleased, on Tuesday, without any
new light on the subject, and without the knowledge of the
attorney, was entertaining a proposition from O'Bannon to
settle, and was so 'disposed to favor him' that he would
have paid the full amount right down except that it had not
been assessed and collected, and actually paid $1,000 down,
gave the company's note at sixty days for another thousand,
and a *verbal* promise to pay $3,000 more, to which all claim
had been abandoned, as soon as it should be assessed and
collected, and gave directions to have it assessed and col-
lected as soon as possible. Considering, further, that noth-
ing was yet due, that the financial condition of the company
was not such as to justify any needless liberality in the settle-
ment of claims against it, and that the book-keeper at the
adjoining desk, who was probably within hearing of the
whole arrangement, when he did 'proceed to draw up the
papers,' proceeded further to enter the transaction on his
books as a settlement for $2,000 and no more, the statement
that the secretary then agreed to pay the further large sum
of $3,000 seems but little less than monstrous."

This agreement to settle for $2,000, proved by the cir-
cumstances and by the direct testimony of Walker, and now
conceded, was made in good faith; for if the parties had
then conspired to get from the company $5,000, it is
morally certain that they would not have made Walker a
witness to their agreement on $2,000. And unless that
agreement was abandoned and a new one made before the
note and check were delivered, then it was also executed in
good faith. The evidence proved to our satisfaction that
there was no such change in the agreement. To the rea-
sons suggested in the above quotation, no answer has been
attempted. The papers executed were in accordance with
the agreement. There was no time after it was made and
before the delivery of the papers, sufficient for the concoc-
tion of such a conspiracy as is charged, or any material

change in the terms of settlement so agreed on, nor any afterward, and before O'Bannon returned to Raymond; for, upon receipt of the papers, he left the office, and there is no evidence or reason for the belief that in the meantime he had any meeting or communication with Edwards; and if he did, it would seem to. be the height of assumption and presumption to suppose that he would have broached or Edwards dared to suggest to him the idea of such a conspiracy. Nothing in his conduct or reputation or relations to Edwards or to appellee appears to warrant, but everything to forbid it. His life for nearly nine years afterward, at Raymond and Litchfield, was a continuous and emphatic denial of it.

The fact of a *bona fide*, executed settlement for $2,000 being thus established, it follows that he could not have intended to admit to Miller or anybody, at any time, that he collected or received $5,000; and that the question of false representation as to the cancer letter—if any such was made, which we do not believe—is immaterial.

For the reasons thus indicated and others, more fully set forth in the opinion filed (32 App. 483-7), this second judgment was reversed and the cause remanded. Having seen no reason to retract or modify the expression of our views of the law or the evidence as to any material point presented by the record then before us, we might here have simply referred to it, for those we still entertain, so far as applicable. But out of respect to counsel and their elaborate argument, if not also in justice to ourselves, we have repeated them, condensed and somewhat rearranged in their order, as a better introduction to what is now to be said on the bearing of the new evidence.

The points now urged as against the conclusion of the court on the former record are, (1) that there is not nor ever was, any evidence that the receipt on the policy was drawn or signed on January 5, 1875; (2) that the agreement in Walker's office to settle for $2,000, was made on the morning of the 4th, and a new one for $5,000 on the 5th, when the note and check were given; and (3) that the new testi-

mony of Mr. and Mrs. Hill fully proved O'Bannon's admission that he collected $5,000. It is said the legal presumption is, that he signed the receipt as it now appears, and the inevitable conclusion from that fact and the testimony respecting his admission, is that he did collect that sum.

It is true of the receipt that Terpenny did not and would not give the date of its preparation, doubtless for the reason, and only for the reason, that it bore none on its face; for the occasion fixed the time just as certainly, and he had testified before, and not less than five times on the last trial, that he wrote it while O'Bannon was in the office, and further, that he never saw him there but the one time. To this there was no contradiction, and, in connection with other facts, it is conclusive.

We are content to submit our finding that O'Bannon signed it on that occasion, upon the reasons given in the former opinion (32 App. pp. 483–7), which remain unanswered. The new evidence for appellee presents nothing in opposition to them. Having then received the check and note, then was the proper time to receipt for them. There was every reason why he should and none why he should not. Edwards was an experienced business man, acting for the company. Such men do not make such payments without taking receipts. It was especially proper in this case, because O'Bannon was but an agent and his principal might not ratify the arrangement. His right to refuse was expressly reserved. No other receipt than the one so indorsed is claimed to have been given by him at any time.

We think it has already been sufficiently shown why the statement of Ryan on the second trial, that Edwards agreed to pay the further sum of $3,000 when assessed and collected, ought not to have been believed; but his statement on the last, and the new evidence for appellant, call for some further observations in regard to it.

On the second trial the testimony of Walker preceded his. He now says he thinks he did not read it before he testified, but that he had some conversation with appellee and Mr. Truitt, his attorney, and they told him, in a general way,

about it.   Walker had said he had been under the "impression" that the meeting in his office, when the agreement to settle for $2,000 was made, was on a *Monday* morning, in the latter part of December, 1874, or first part of January, 1875.   A good many years had since passed.   He said : " Of course it is simply an impression that has got on my mind. I don't know why I have got the impression."   It appearing that the 4th of January, 1875, was a Monday, and that the note and check and receipt for Vigus to sign, and the entry on the book that the note was given for the " balance due on policy 4266," were all under date of January 5th, and that O'Bannon had said he made the settlement on the second day he was in Chicago, it was seen that appellee's claim was to be upheld only by the slender thread of Walker's unaccountable " impressions," upon the basis of some proof that when the settlement was actually made, there was an equally unaccountable *verbal* agreement to pay $3,000, supplementing two written obligations for $1,000 each.   And Ryan, whose devotion to Edwards was shown, furnished the proof of such a sudden, great and unaccountable change in the agreement.

For the reasons indicated in the quotation above made, we thought and said it was more probable that Walker's impression as to the day was wrong than that any such change was made.   But Ryan, since he furnished that proof, has read the preceding testimony of Walker.   At first he denied it, but being confronted with his own letter to Walker stating that he had, he admitted it.   Whether he had also read the opinion of this court does not appear. But for some reason, his clear and positive statement turns out on this trial to be also at best only an " impression," quite as vague and shallow as that of Walker.   He says : " The settlement of the Vigus claim was talked between Edwards and O'Bannon.   I did not pay special attention to the details.   *   *   *   My best recollection is, it was agreed to pay $1,000 cash, and note payable about the time the money would come in.   *   *   *   He stated, I think, it was a great favor they were extending O'Bannon in making

advance payment, as the company was entitled to the date fixed. * * * Nothing was said about the result of the money due on the policy, in my presence. As I stated, I am not very clear as to what was said about the balance being paid when the claim was assessed and collected. My best recollection is, he was impressing on him that he was doing a favor; that the balance would be paid inside of ninety days, after the assessment. My best recollection is, this was stated—be paid when the assessment was collected." On cross-examination he says: "Edwards ordered a check for $1,000 and a note for $1,000 on the Vigus claim, to be drawn up. I am not positive as to what was said about a balance. Have only a vague impression. Would not swear anything in relation to it, so void is my mind as to what was said." We regard this as a substantial recantation—an admission that according to the statement of Edwards on that occasion the settlement was for a check (cash) and note at sixty days each for $1,000; that the favor shown was by the payment in advance of the time mentioned in the policy; that the balance to be paid when assessed and collected, if anything of the kind was said, was the balance for which the note was given, as entered on the books, and not the further sum of $3,000, of which nothing was said in his presence. The whole of the "talk" was confined to the time of payment of the amount agreed on—O'Bannon wanting cash, and Edwards insisting on the time for a part. Thus the testimony of Ryan is additional evidence of an actual settlement for $2,000, and that it was made in good faith.

The other contention of counsel is also shown to be groundless. Walker's impression as to the time of the meeting and agreement in his office, was wrong; it took place on Tuesday, January 5th, and immediately preceding the execution of the papers, in the office of Edwards, as is more fully proved by the new evidence.

Walker testified before, and now also, that the meeting was in the *morning*. Counsel's position was that it was *Monday* morning, and that the parties had all the afternoon

and evening after the agreement, in which to conspire, before the papers were executed. We thought it was Tuesday, because they would naturally proceed to execute the agreement immediately, since it would require only a few minutes' work, and the office of the secretary and bookkeeper was just "down stairs," whither they went together; and further, because of the improbability that the preceding meetings and discussions and the intervals of time between them, together with the meeting in Walker's office, could have all occurred on the same morning, as they must if the latter, which was the last, was on Monday. First, O'Bannon, after a night ride in the cars, met Edwards—where or at what time was not shown—and they had a talk, doubtless somewhat lengthy, as it involved the justice of the claim and the question of a compromise; afterward, how long is not shown, Edwards saw Walker, told him O'Bannon was in town about the Vigus claim, that he had talked with him about a compromise, offered him $2,000, which O'Bannon had not accepted, and that he probably would if advised by Walker to do so; and then, after another interval, how long did not appear, Walker says O'Bannon took him up to his office, went over the case and advised him to accept the offer made. All this took place before Edwards was called up and the agreement made. We still think it highly improbable that all of this took place on one morning. The question, however, is only as to the last, when the three parties were together and the agreement was made.

We regard the point of the time when it was made, within the period from O'Bannon's arrival in Chicago to his receipt of the note and check, as of no importance whatever to the defense of appellant, because, in our judgment, the idea of such a change in the agreement as is claimed, within any time that can be pretended for it, is on its face not to be entertained. Why, Ryan himself says that in the very conversation between them when the papers were drawn up, Edwards told O'Bannon that " there was a dispute about the claim, and an investigation, owing to letters from his

locality in regard to Mrs. Vigus' condition," though he could not say what was said, particularly, as to their contents. And yet it is seriously claimed that he promised to pay $3,000 more than had so recently been agreed on; Ryan added that when Edwards told him about the letters O'Bannon, in substance, stated that "some enemies or unfriendly parties had been interfering with other people's business," which may help to explain the cancer testimony, and to show that the parties were still dealing at arm's length and O'Bannon was still faithful.

Counsel for appellee seem to see that unless by way of this idea of a change in the agreement, his every approach to a recovery from this estate is solidly excluded by the evidence; and therefore, whether a sufficient reason can or can not, at least a sufficient time and opportunity to make it, must be shown. Though proof of these might not materially aid his case, the want of it would be fatal. Important as it is to him, the whole argument for the time claimed is as follows:

"On Sunday night, January 3, 1875, O'Bannon started to Chicago, where he arrived the next morning * * * and it seems called *at once* on Edwards. After seeing Edwards, O'Bannon seems to have left the place of meeting, for when Edwards saw Walker *that morning, so Walker says*, the former told the latter that O'Bannon had come to Chicago on the Vigus matter, and that he, Edwards, had offered $2,000 to settle the claim, and that he thought O'Bannon would accept it if Walker saw him and talked to him. We call particular attention to what Walker says. In response to the question, what Edwards said, he answered: 'Said Dick O'Bannon was in town.' For what purpose did he say he was in town? 'Said to me, Uncle Dick Bannon is in town; was up to see about the Vigus matter, etc.' This language clearly shows that O'Bannon's coming *must* have been of very recent occurrence; that he had *just* had his first interview with Edwards; that it *must* have been the first morning he was there; otherwise his old friend Walker *would* have sooner heard of it. Now, as O'Bannon left Ray-

mond Sunday night, and would naturally arrive in Chicago the following morning, *the conclusion must irresistibly be that it was on Monday morning, January 4, 1875, that O'Bannon was in Walker's office.* Walker then says that he watched for O'Bannon at the foot of the stairs, from which they went to Walker's office."

We find in the evidence no warrant for such positive use of any of the terms we have italicized; nothing to show with any definiteness at what time of the day or even on which of the two days O'Bannon first saw Edwards, how long he remained with him, how soon after they separated Edwards saw Walker, or how long he remained with him. All of these are matters of mere conjecture, or at most of very uncertain probability. It may have been as counsel assert, but it may not. For all the purposes of this case these assumptions may be conceded. We call attention to them only to show the looseness of the argument. But it would still be very easy to resist the conclusion last stated from the given premises or any other reasonably supported by the evidence, even as it appeared on the former trial. Now, consider the testimony of Walker on the last one. After stating the offer of $2,000, and its acceptance, he proceeds : " They then went down stairs together. I saw Edwards at twelve o'clock, as I went to lunch. I went into his office and said, " You and Uncle Dick settled the matter," and he said " Yes." I saw Uncle Dick that afternoon and said to him, " You are lucky; you and Edwards have settled the matter;" and he said, "Yes, have settled."

The conclusion from this language that it was *not* on Monday morning, January 4, 1875, that O'Bannon was in Walker's office, is so natural, reasonable and plain that we draw it without hesitation. The twelve o'clock mentioned was the twelve o'clock of the same day they were in that office; they *settled* before that hour; and the settlement was made, as the papers show, on Tuesday, January 5, 1875. It was immediately on going down stairs together that they arranged the mode of payment and executed these papers. This was manifestly done in good faith. There was no

time or reason for the asserted change in the agreement and none whatever was made. Further, when Edwards was seen at twelve o'clock, O'Bannon was not with him, and when O'Bannon was seen in the afternoon, Edwards was not with him; and, as before said, there is not a particle of evidence tending to show that they were again together at any time before O'Bannon returned that night to Raymond. His report to appellee the next day that he had settled the claim for $2,000, and could get no more, was therefore substantially and literally true.

That he had then conspired with Edwards to get more, or had a thought of getting it in any way, is a proposition without the least support in the evidence, so far as we can see. It does not appear that Edwards himself had any such design until just before the $1,000 check was drawn. The new proof shows that in December he wrote to Walker, the company's attorney, that this claim should be compromised. On the former trial, as on this, it was shown that the assessment for this claim, as presented to and approved by the executive board, was for $2,500 (as it would be according to the custom, as proved, if it was compromised at $2,000), and it was so stated in the notices to members sent out in February, though the amount required to be paid by each would raise $5,000. Ryan said the $2,500 got in by mistake or misprint, which may now be doubted. But however that may be, Walker testified on this trial that early in February Edwards and Ryan came into his office with these notices and asked his opinion as to the propriety of sending them out.

He told them that this claim was compromised at $2,000 and assessed for at $2,500; that these notices were wrong and ought not to be sent out, to which Edwards replied that " there was no time to reprint them now, and if anybody kicked he would send the money back;" that he represented $25,000 of the company's stock, and that in consequence of this statement of Edwards he then determined to get out; and that though he made no further complaint about the matter, he did leave the company in the following May or June. Counsel indulge in an insinuation

O'Bannon v. Vigus.

against Walker because he did not call attention to this over assessment which we think gratuitous, since, according to his understanding and the statement, it was simply a premature collection and the excess would still inure to the benefit of the members, according to the regular course of business, as shown, because it would be turned to the contingent assessment account. Walker therefore discharged his duty when he advised as strongly as he did against the sending out of those notices. The point we are making, however, is that Edwards was then fully aware that Walker knew the claim had been settled for $2,000. It had been so declared and admitted in the presence of Ryan. (It is true that Ryan testified he had been instructed by Edwards to make the assessment for $5,000, and did so; that he had no recollection of the conversation related by Edwards; and at first positively denied that he was ever in his office while he was connected with the company, but on having his attention called more particularly to it admitted his mistake.) It is hard to believe that Edwards, in the face of this knowledge of Walker, then intended to rob the company of this excess of $3,000. Yet it may be that a month later—Walker in the meantime making no further complaint about the assessment notices and preparing to leave the company—he may have formed that purpose.

The excess would be collected early in March. A check for it could then be drawn to balance the books and look regular, but need not be paid until Walker was out. Ryan was his friend, whose conduct in this connection is questionable. Edwards had the receipt of Vigus in full and could fill up the blank in that of O'Bannon with "five thousand." These would satisfy the company that he had paid to the beneficiary the full amount of the policy and explain the mistake in the representation of the assessment as for $2,500. He could easily find somebody who, for a consideration, would imitate the signature of Vigus, in his possession, and if he recognized the indorsement the bank would not question it, and he could abstract the check when returned.

For such reasons as these he may have concluded to take the risk. We do not say this is the true explanation of the facts proved, but we see no other. Counsel for appellee are compelled to charge, and do charge, Edwards with complicity. We, too, are fully satisfied that if O'Bannon is guilty, he also must be; for O'Bannon, without his aid, could not have obtained the check. But it is clear that after Edwards got the receipts of O'Bannon and Vigus, he had no need of O'Bannon's aid; and we fully believe, as we have endeavored to show from the evidence, that O'Bannon gave his and procured that of Vigus without a thought of wrong.

Of the testimony of Mr. and Mrs. Hill but little need be said. We regard it as wholly unreliable, in itself, and abundantly contradicted by the facts and probabilities of the case. They do not themselves agree. They were not witnesses of a kind to be relied on as to the precise language used in a casual conversation fifteen years before and never thought of in the meantime—not for lack of honesty, but of intelligence, discrimination and nice observation. They first talked it over with a zealous attorney for appellee, to whom we impute no improper purpose or method, but every experienced lawyer knows the tendency. Mr. Hill was a farm tenant; he testified that in April or May, 1875, he and his wife were in the store of O'Bannon (J. D.) & Vigus, where they generally did their trading; that she then had an interest in a policy of this company on her father's life; that crops were poor, it was hard to keep up payments, and they had talked of letting it lapse; that as he came into the store after her, R. W. O'Bannon said to him that his wife had been telling him this, and advised them not to do so; that he said it was a good, reliable company, and that he had just *collected* $5,000 *on* this Vigus policy. On further examination he testified that O'Bannon might have said he *settled* the Vigus *policy for $5,000*, though he thought it was the other way; then, that he said, " I *received* $5,000 on the policy; " then, again, that the word was *collected*, of which he was pretty certain; then, that he could not give the

O'Bannon v. Vigus.

identical language, and finally, "my best recollection is that he said *settled.*" It appears that from O'Bannon's language, whatever it was, this witness got the impression that he had received the insurance, as he easily might from the statement that he had "settled" the claim on a $5,000 policy, and therefore, naturally enough, he so testified at first; but he made it just as clear afterward that he couldn't pretend to be confident as to the language. His testimony on the whole shows it more probable that O'Bannon said he had settled a $5,000 policy, or a claim on such a policy, than that he said he had collected or received $5,000 on it. Mrs. Hill, who was excluded during his examination, with a like impression received in the same way, testified that the conversation occurred in May, 1875, which she thought was only eight years ago, and that O'Bannon said he collected the full amount, $5,000, and that she could give his exact words. She stood immovably by her first statement. Giving her full credit for honesty, it may yet be observed that a woman, as ignorant as she, and unused to courts, might naturally be inclined to resent a cross-examination, however proper, and show herself quite unreasonably persistent and positive. And conceding that the jury, with better means than ours, discovered in her manner no sign of such a weakness, we still think her statement unreliable in its nature and untrue in fact. There was plenty of room for a misunderstanding, and of time for a failure of memory. Her husband's "best recollection" of it is different. It is refuted by the accumulated evidence of an actual and honest settlement for $2,000, to which we have referred. Its strange inconsistency with the whole current of his statements on that point, from January 6, 1875, when he reported that settlement to appellee, doubtless to and beyond the time of the conversation with the Hills, can not be explained or rationally accounted for. The amount of the policy, his mission to Chicago, its somewhat disappointing result, and its reluctant acceptance by appellee, were generally known and talked of in that little community. O'Bannon made no secret of it. He enjoined secrecy upon nobody to whom he told it, and he

told it to many persons and on many occasions. Nor was there anything more secret or confidential in his talk with the Hills. J. D. O'Bannon was in the store waiting on customers. Vigus himself had gone out, but for aught that appears was liable to return while that talk was going on. To all these persons on all these occasions he stated that he settled for $2,000, and could get no more. On what principle or course of human conduct, common or exceptional, can it be believed upon such testimony as Mrs. Hill's, that he told her he collected the full amount, $5,000?

The theory of appellee's case is itself strongly against it. That is, that on the 4th or 5th day of January, 1875, O'Bannon entered into a conspiracy with Edwards to defraud appellee of $3,000, by making it to be believed that his claim was compromised for only $2,000. According to this theory, the most important thing of all he was to do and to keep carefully and constantly in his mind to do, was to conceal the fact that he had collected or received $5,000 on that policy. It was the very gist of the supposed conspiracy. If he was in it he was bound by every motive of interest, hope and fear to guard against every word or act that might lead to a suspicion of that fact. And yet it is claimed to be overwhelmingly proved that in the open store of his victim, where he had so often and to so many asserted the contrary, without the slightest rea so 1 or occasion, and apparently with the utmost coolness and unconcern, he was blabbing the secret he was so vitally interested to keep. And then he went right on for nearly nine years, to the day of his death, living and acting as though he had never either blabbed it or possessed it.

In striking contrast with counsel's view and treatment of this testimony is that of Mrs. Alice O'Bannon, to a statement of Major McWilliams to appellee at her dinner table— a statement of a character not to be misunderstood, nor, with her interest in it, forgotten. She did not pretend to repeat his words, but gave the substance. It is not incredible that McWilliams, for reasons of his own, then thought O'Bannon did get the money, and afterward became convinced that

he did not. It would have been unprofessional in him, as an attorney in the case, to testify for his client at her instance; but no reason is perceived why appellee should not have called him except the apprehension that he would corroborate Mrs. O'Bannon. We do not propose to consider that branch of the case, and refer to this testimony only because it was new on the last trial, and the argument seems to show how far and inconsistently one may believe and disbelieve, according to his interest.

The position of Miller was not materially improved by his last statement, and our opinion of it is unchanged. So, also, as to the alleged statement about the cancer letter.

Questions of law, mainly upon the instructions, have been argued at great length, with an immense array of authorities, but we think it is unnecessary and would be unprofitable to consider them. The objections urged to those given for the plaintiff are for alleged assumptions of fact. Of course the court did not so intend or understand them, as to such facts as were controverted or required to be proved. If, however, the language and punctuation used might have misled the jury, they can easily be made more clearly hypothetical on another trial. From the first we have believed that this case might and should be disposed of on its merits, as shown by the evidence, conceded to be competent and proper. Each of the new trials has deepened and strengthened our convictions as to the facts which should dictate the finding. Upon the question whether R. W. O'Bannon ever received upon the policy anything whatever other or more than the note and check he reported and delivered to appellee, or by conspiracy with Edwards enabled him to get it, we regard the case as not a close one. In our judgment, after three trials, carefully reviewed, the negative is established by a clear and satisfactory preponderance of the evidence—proving not only that the deceased did not commit the wrong shown, but that another, without his concurrence or knowledge, did. Whatever may be claimed for the *prima facie* case for plaintiff, it was overcome and overwhelmed by the defense. Of the receipt, its

integrity as well as its truth, was impeached. What the Supreme Court has said of the weight of a receipt as evidence and of the kind and amount of proof required to overcome it, was said of those conceded or shown to be genuine, and to have been executed as they appear on the trial. That it was forged or altered after its execution, may be proved by a bare preponderance. This was so altered, and by the insertion of a falsehood, as shown by far more than a bare preponderance. The alleged verbal admissions are not truly reported. They were never made. The testimony in relation to them is otherwise easily explained. The more it is considered, in the light of the theories of the case on both sides, of O'Bannon's life and conduct before and afterward, and of the other independent evidence that the fact was not as claimed to have been admitted, the more clearly it is seen to be unworthy of consideration. This verdict, then, is unsupported. On the other hand, it is shown by direct and positive evidence, and not left to inference, that O'Bannon was authorized and expected to compromise the claim; was met with a denial of its justice, an argument against its allowance and an offer of $2,000; resisted the argument and declined the offer, or left it unaccepted; the next day, upon further argument by Walker reinforcing that of Edwards, agreed to accept it; immediately afterward received the note and check and signed the receipt on the policy left with Edwards; returned home that night and the next day reported to appellee. On maintaining and forwarding his receipt, his agency ceased. The assessment and collection for the loss, the alteration of his receipt, the drawing of the $3,000 check, its presentation, payment, return and abstraction, all took place afterward, at Chicago, more than two hundred miles from Raymond. We think we know who were concerned in each and all of them. There is not one particle of evidence tending to prove that O'Bannon had any connection with either, except the alleged admissions. The fact that he visited Chicago in the spring, if a fact, at most proves only a bare possibility, most remote. Any and every inference of

his guilt must presuppose a conspiracy on the 4th or 5th of January, 1875, which could not then have been formed. The conspiracy can not be legitimately argued from assumed facts whose existence must in turn be argued from the assumption of the conspiracy. Excepting the admission, such is, in our opinion, the character of the argument here made, and the claim of such admission seems to us well nigh absurdity.

The verdict, then, was not only unsupported by the evidence, but against the great weight and body of it, and therefore should have been set aside. We can account for it only by the fact that the Supreme Court had reversed a judgment of the Circuit, and of this court, affirming it, in favor of the defendant, and by what, from our observation, seems to be the natural leaning of jurors upon the issue here involved. Of all that they are called on to determine in civil actions, about the easiest to be proved and the hardest to be answered, is that of fraud. In such cases it too often appears that to them, as to the jealous, " trifles light as air are confirmation strong as proof of holy writ."

The judgment of the Circuit Court will be reversed and the cause remanded.